IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ELIZABETH A. WILSON,

                        Plaintiff,                         OPINION AND ORDER

        v.
                                                          17-cv-934-wmc

GREENCO INDUSTRIES, INC.,

                        Defendant.

        In her complaint, Elizabeth A. Wilson alleges that her former employer, Greenco

Industries, Inc., violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601

*et seq.*, and the Americans with Disabilities Act and Amendments Act of 2008 ("ADA"), 42

U.S.C. § 12101, *et seq.*, by terminating her employment at the expiration of her FMLA

leave.  Before the court is defendant's motion for summary judgment.  (Dkt. #10.)  For

the reasons that follow, the court will grant the motion as to all claims and direct entry of

judgment in defendant's favor.


UNDISPUTED FACTS[1]

**A. Overview of the Parties**

        Defendant Greenco is a private, non-profit organization that provides a variety of

services to people with severe mental, physical or developmental disabilities.  As part of its

business, Greenco runs a long-term residential program, which consists of five licensed

family homes, each with four beds, and two licensed family homes, each with two beds.

---

[1] The parties' proposed facts extend well beyond the basis for the court's rulings.  Nonetheless, to
provide a complete account, the court has included a number of undisputed facts that are not
ultimately material to its award of summary judgment.

Collectively, these seven homes are, therefore, capable of providing supportive living services to a total of 24 adults with a range of disabilities. This long-term residential program is managed by two "Supportive Living Services Coordinators," who oversee resident care and building maintenance.[2]

Plaintiff Wilson was hired as one of these two full-time Coordinators on January 8, 2003, and she served in that capacity until her termination on March 28, 2016. As a Coordinator, Wilson was responsible for supervising approximately 35 caregivers working in the residences, as well as coordinating the care of approximately 24 residents. While Wilson's day-to-day duties varied, they typically included managerial work (such as scheduling staff, creating individual services plans, and overseeing employee work), and more hands-on responsibilities (such as escorting residents to doctors' appointments, assisting residents in getting into and out of vehicles, doing occasional maintenance like lawn work and basic plumbing problems, and assisting residents with personal care).[3] Wilson was also required to be on call in case a caregiver was unexpectedly unable to make his or her shift.[4]

Coordinators are directly supervised by Greenco's Chief Executive Director. Beginning in 2001, Greenco's Chief Executive Director was Jean Zweifel, and she was

---

[2] However, plaintiff points out that since her termination on March 28, 2016, until at least May 15, 2017, Greenco employed only one Coordinator.

[3] Greenco created the Coordinator position in 1997, and its job description was last edited in 2005, although plaintiff points out that she received a two-page description enclosed in a January 26, 2016, letter from Greenco, which she had never seen before.

[4] For their part, caregivers assist residents directly with a variety of activities, including feeding, bathing, going to the bathroom, and helping them in and out of bed.

plaintiff's direct supervisor at all relevant times. In September 2012, Chad Mathys was hired as Greenco's "Assistant Director," working under Zweifel. At that time, however, Mathys did not manage any employees, and he did not have the authority to hire or terminate any employees. In January 2016, the Board changed Mathys' job title from Assistant Director to "Executive Director." Although Zweifel remained the *Chief* Executive Director, and accordingly Mathys' supervisor, Mathys was training to take over the CEO position upon Zweifel's retirement. After his change in title, the parties dispute whether Mathys had supervisory authority over Wilson. Still, there is no dispute that, while it was Zweifel's responsibility to evaluate Greenco employees' requests for accommodations for work restrictions or disabilities, Mathys sometimes assisted in those evaluations.

### B. Wilson's History of Back Surgeries and FMLA Leave

Shortly after a motor vehicle accident in 1992, Wilson began experiencing problems with her back and neck, and she was diagnosed with degenerative disc disease. Wilson's neck and back pain worsened overtime, and by June 2012, the pain made it difficult for her to sit at a desk for long periods, do maintenance work and assist residents in getting into and out of vehicles. As set forth below, between 2012 and 2015, she underwent three surgeries on her neck and back, all performed by Dr. Christopher Sturm at Mercy Health System in Janesville, Wisconsin, and all giving rise to FLMA leave.

On June 20, 2012, Dr. Sturm performed lumbar spine surgery, which included fusing Wilson's spine at the L4-5 and L5-S1 levels. Well in advance of that surgery, on April 30, 2012, Wilson requested, and Greenco granted, two to three months of medical leave under the FMLA, to commence on June 20. During this FMLA leave, Wilson

regularly checked in with Greenco to advise how her recovery was progressing.

By letter dated September 12, 2012 -- approximately 12 weeks after the commencement of the leave -- Kelly Casper, a nurse practitioner, notified Greenco that Wilson needed to remain off work for an additional four to six weeks to heal and that she would also require modifications upon her return to work. In turn, Nurse Casper notified Greenco in a September 25, 2012, letter, that Wilson was authorized to return to work on October 1, 2012, with the following restrictions:

> Sedentary/light duty work
> Lift less than 10 lbs
> Waist to Waist lifting only
> No crouching or squatting
> Alternative sit/stand positions at least every 30 minutes
> Allow 15 rest breaks ever[y] 2 hours if needed[5]
> No tasks that require frequent forward bending
> Start 4 hours/day, 3 days/week x 1 week, then if tolerating, 4 hours/day, 5 days/week x 1 week, then advance hours/day as tolerated.

(Def.'s PFOFs (dkt. #12) ¶ 35.)

As a result of first surgery, Wilson was ultimately allowed 12 weeks of FMLA leave and an additional 2.5 weeks of non-FMLA leave. At her deposition, Zweifel testified that Greenco "tried to follow the family medical leave, but if people asked, we would give them more time or they might come back part-time or whatever." (Defs.' Resp. to Pl.'s PFOFs (dkt. #27) ¶ 23.) When she returned to work on October 1, Greenco also accommodated the restrictions identified in Casper's letter. Wilson increased her work to full-time by approximately October 10, but continued with her 10-pounds lifting restriction.

---

[5] The court assumes that this means 15-*minute* rest breaks.

On August 21, 2013, Wilson underwent her second back surgery, this time a two-level cervical fusion at C5-6-7.  Again, Wilson previously requested, and Greenco granted, up to 12 weeks of FMLA leave to begin the day of the surgery.  On November 19, 2013, Dr. Sturm notified Greenco that Wilson was authorized to return to work as of November 20, with the following restrictions:

> No repetitive flexion/extension of the neck
> Lifting less than 10 lbs for one month, then she may progress
> to lifting less than 20 lbs
> She must be able to change positions as needed.

(*Id.* at ¶ 42.)  Accordingly, Wilson was allowed 12 weeks of FMLA leave and 1 week of non-FMLA leave for this second surgery.  When Wilson returned to work on November 20, Greenco again accommodated the identified restrictions.  At some point, Wilson advanced to lifting 20 pounds, though that restriction was never lifted and Greenco accommodated that restriction.

On November 23, 2015, Wilson provided Greenco with two letters regarding her need for a third surgery, both dated that same day.  The first was a letter from Dr. Sturm, staying that Wilson "is to be off work starting 11-23-15, starting at noon until she is cleared by Neurosurgery" because "[s]he is waiting for surgery approval from her insurance company."  (Def.'s PFOFs (dkt. #12) ¶ 49.)  The second letter was from Wilson requesting "a leave under FMLA effective immediately."  (*Id.*)  Greenco once again granted this requested leave, with Zweifel informing Wilson that she would be eligible for FMLA leave through the end of the year, and for another 12 weeks of FMLA leave beginning January 1, 2016.  On December 4, Wilson and Zweifel also had an in-person meeting regarding Wilson's requested FMLA leave, at which Zweifel provided Wilson with a one-page sheet

regarding FMLA that both parties signed.

On December 16, 2015, Wilson underwent her third surgery for a two-level lumbar fusion at L2-3 and L3-4. At some point after that surgery, Wilson and Zweifel spoke generally about her recovery. (Def.'s Resp. to Pl.'s PFOFs (dkt. #27) ¶ 44.)

In January 2016, Wilson mailed a letter to Greenco that was drafted by Alyssa Watring, a physician assistant for Dr. Sturm, dated January 15, 2016. In the letter, Watring stated Wilson "is required to remain off work at this time" and would "return for her next follow-up in approximately 2 months, at which time return to work status will be reevaluated." (*Id.* at ¶ 60.) At the bottom of the letter, Wilson added a handwritten noted stating that her "[n]ext appointment it scheduled for March 29th." (*Id.*) Zweifel reportedly interpreted this letter as indicating that Wilson was returning to work in mid-March and Wilson's note as just informing her of a doctor's appointment on March 29, so that she could take that time off. Given that Watring's letter expressly stated that her "work status" would be reevaluated at her next doctor's appointment, which Wilson had noted was not until March 29, Wilson disputes that Zweifel's interpretation was reasonable. Regardless, there is no dispute that neither Mathys nor Zweifel contacted Wilson to discuss her return to work.

## C. January 2016 FMLA Leave Designation Notice

Sometime in January, Greenco revised its employee handbook with the assistance

of a VP of Human Resources for Colony Brands.[6]  As part of that process, Greenco's FMLA leave policy was discussed.  The Colony VP provided Mathys with a form letter and an FMLA designation notice, instructing Mathys to send each of these documents to all persons who take FMLA leave to ensure that these employees were aware of the length of FMLA leave.

As part of this same process, Mathys and the Colony VP also determined that Wilson's FMLA leave was set to expire on March 25, 2016.  Reviewing the January 15, 2016, letter from Dr. Sturm's physician assistant, Watring, Mathys noted that Wilson's next appointment to return to work was scheduled *after* the expiration of her FMLA leave period.  Using the form letter provided by the Colony VP, Mathys then promptly sent the following letter to Wilson on January 26, 2016:

> We recently received your physician's statement dated 01/15/2016 outlining that you need continued leave through your next Doctor's appointment on 3/29/2016. The Family Medical Leave Act (FMLA) entitles eligible employees to take up to 12-weeks of job-protected leave for medical reasons per calendar year. In addition, the Wisconsin Family Leave Act (WFMLA) entitles you to 2 weeks of leave for your own medical reasons per calendar year. These leaves will run concurrently and your time off will be counted under both entitlements.
>
> After reviewing the information, you will exhaust your 2016 12-week leave entitlement under the FMLA as of 03/25/2016. You have no additional job-protected FMLA leave available this calendar year. We are unable to grant any additional leave past this date. We are expecting that you return to work on Monday, March 28, 2016. If you are unable to return to work on that date, your employment will end and your employment

---

[6] Defendant does not explain its relationship with Colony Brands -- for, example, whether it is an affiliated company or a consulting firm -- though this is not ultimately material for the reasons explained below.

record will reflect that you were unable to return to work after approved leave. Should that happen and you would still like to work for Greenco Industries, once you are physically able to work, you would need to re-apply for an open position and go through the normal application process.

Please feel free to call me if you have any questions or require further information.

(Def.'s PFOFs (dkt. #12) ¶ 67.)[7] This letter was sent by certified mail and it was received by Wilson on January 28, 2016.

In addition to the letter, Mathys included a job description of the Coordinator position because he believed that the FMLA designation notice instructed him to do so. Wilson contends that she had not seen this two-page job description before, recalling only a one-page description she last received in 2005. There were a number of differences between the one-page job description and two-page job description, including educational requirements, physical requirements, qualifications and essential versus non-essential job duties. Greenco does not dispute this, but points out that any different physical requirements -- specifically a 50-pound lifting requirement -- were not material given that Wilson had not been required to perform certain job duties due to previous medical restrictions, which Greenco had consistently accommodated. Nevertheless, by including the new, two-page description, Wilson avers that she understood "Greenco was informing her that it would not allow her to return to work until she could perform all of the job duties listed in her description." (Pls.' Add'l PFOFs (dkt. #24) ¶ 72.)

---

[7] Before working with the VP of Colony Brands, Greenco did not, as a matter of normal policy and practice, communicate with an employee on FMLA leave to inform them of when their leave would end.

Mathys testified at his deposition that he added the two sentences at the end of his January 26 correspondence to Wilson to "soften the letter," because he thought the form letter "sounded too harsh." (*Id.* (citing Mathys Dep. (dkt. #18) 22-23).) Despite the express language in the letter that "[i]f you are unable to return to work on [March 28] your employment will end," Mathys also testified at his deposition that he hadn't "anticipated" that Wilson's employment would be terminated on March 28; instead, he thought that "she was going to be calling us and letting us know what her return date may be." (Mathys Dep. (dkt. #18) 24.)

For her part, before receiving the Mathys letter, Wilson understood that she was entitled to 12 weeks of FMLA leave, but reportedly did not know whether she was entitled to 12 weeks in a calendar year or a 12-month period because she had not been given the proper FMLA paperwork for her first two surgeries. Before receiving the January 26 letter, Wilson also testified not to have known that her FMLA leave was set to expire on March 25, 2016, nor had she contacted Greenco to ask. Indeed, at her deposition, Wilson explained that she did not anticipate any issues after her third surgery because Greenco had been very accommodating in the past.

Despite Greenco's past flexibility, Wilson interpreted the letter from Mathys as informing her that she would be terminated if she did not return to work on or before March 28. Still, Wilson did not call Mathys, Zweifel or anyone else at Greenco to discuss the letter or request additional leave.

Wilson *did* move up her next appointment date to March 23, 2016. At that appointment, Watring determined that Wilson was not physically able to return to work,

9

and Watring was apparently unable to inform Wilson when she would be able to do so. Instead, Watring provided Wilson with a letter stating that she was not able to return to work and indicating that her return-to-work status would be evaluated again at a follow-up appointment in three months. However, Wilson did not provide this letter to Greenco. Wilson also did not inform Greenco that she would not be returning to work on March 28, nor did she otherwise contact Greenco to ask them to extend her leave.

After failing to return to work on March 28, Wilson assumed that her employment had been terminated as set forth in the January 26 letter. After March 28, Greenco never informed Wilson that she was terminated,[8] nor did Greenco evaluate whether it could accommodate a request for additional leave beyond the requirements of the FMLA. At the same time, as Greenco points out, Wilson never made a request for additional leave.

### D. Medical Reports Post-March 2016

In a March 30, 2016, letter signed for Principal Financial Group, which the court assumes is a disability insurance provider, Dr. Sturm confirmed Wilson's March 23 appointment, noting that her next exam would occur on June 23, 2016. Sturm also indicated that it was typical for patients who undergo this surgery to remain off work for four to six months.[9] On April 15, 2016, Sturm sent Wilson a follow-up letter stating that

---

[8] At times, Greenco appears to dispute that Wilson was terminated at all, even though there is no dispute that in an October 7, 2016, statement to the State Department of Workforce Development, Greenco "acknowledge[d] that [Wilson] was terminated from employment on or about March 28, 2016." (Pls.' Add'l PFOFs (dkt. #24) ¶ 84.)

[9] This report was consistent with information provided to Principal in forms dated December 4, 2015, and June 16, 2016, both of which indicated that the post-operative recovery period was four to six months and estimated her return of work would be June 16, 2016.

she should remain off work until June 23, when she would be reevaluated. That letter further indicated that she was unable to sit for more than 30 minutes at a time, was very limited in her range of motion, and needed assistive devices to do activities of daily living. The letter further stated that Wilson "is improving slowly, but steady." (Def.'s PFOFs (dkt. #12) ¶ 95.)

Following her June 23 appointment, Watring sent a letter to Wilson stating that: "[d]ue to [Wilson's] current conditions and restrictions, she should remain off work at this time. The patient will return for her next appointment in 6 months. Return to work status will be reevaluated at that time." (*Id.* at ¶ 96.)

On December 29, 2016, Dr. Sturm's office completed another form for Principal, which indicated that Wilson had an office visit on December 1, that plaintiff (1) was cleared for "modified duty" performing "modified work" subject to "light duty" work restrictions, (2) "was working 14 hours per week," (3) was "[u]nable to tolerate" an eight-hour work day, and (4) would "not be able to return to work doing previous job." (*Id.* at ¶ 97.) As to the latter observation, Wilson contends that Sturm's review was based on his understanding that Greenco would not accept *any* work restrictions and that Wilson's job required her to lift 75 pounds, though it is not clear how Sturm formed either impression. (Def.'s Reply to Def.'s PFOFs (dkt. #28) ¶ 97.) Regardless, Wilson acknowledged in her deposition that as of May 9, 2017 -- approximately 17 months after her third surgery -- her physical condition had not returned to the point where she could resume her work as a full-time Coordinator.

Most recently, on June 29, 2018, Dr. Sturm completed a document entitled "Spine

Medical Source Statement," explaining that since her third surgery, Wilson has experienced "[c]hronic constant low back pain" that is "sufficiently severe to likely interfere with attention and concentration needed to perform even simple work tasks during 25% or more of a typical workday," and that she "would likely be absent more than four days per month if she returned to full-time employment." (Defs.' PFOFs (dkt. #12) ¶ 99.) Sturm also described various other work limitations, including that Wilson is (1) "unable to sit more than 20 to 30 min[utes] at a time," (2) limited her ability to stand/walk to two hours total in an eight-hour day, and (3) unable to lift and carry more than 10 pounds. (*Id.* at ¶¶ 100-01.) Wilson also received long-term disability benefits after her third surgery and continued to receive them as of the date of her deposition, May 9, 2017.[10]

## E. Bonuses

The parties each submit facts pertaining to plaintiff's allegation that defendant reduced her annual bonuses in the years that she took FMLA, which she offers as proof of discriminatory animus. Greenco's handbook provides that "regular employees who have been continuously employed in good standing throughout the previous year (January 1 through December 31) may be considered for year-end bonuses after each annual audit or as determined by the Board." (Defs.' PFOFs (dkt. #12) ¶ 11.) Before 2015, only full-time

---

[10] Wilson acknowledged at her deposition that she understood that receipt of those benefits meant that she was "unable to work." (Def.'s PFOFs (dkt. #12) ¶ 104.) While plaintiff challenges this proposed fact on the basis that it calls for a legal conclusion, nonetheless, her disability insurance policy defines "disabled" as "[y]ou cannot perform the majority of the Substantial and Material Duties of your Own Job," or "You are performing the duties of your Own Job at a Modified Basis or any job and are unable to earn more than 80% of your Predisability Earnings." (Def.'s Reply to Def.'s PFOFs (dkt. #28) ¶ 104.)

employees were eligible. That year, the Board decided to expand it to employees working 30 hours or more per week.

In determining the amount of bonuses, Greenco generally considered: (1) Greenco's financial health and financial needs; (2) the employee's performance and length of service; and (3) the recommendation by the Board and/or the Chief Executive Director. The amount of funds allocated to bonuses generally varied considerably from year to year based on the profitability of the company. The amount of individual bonuses also depended on the number of eligible employees, with more eligible employees generally resulting in lower bonuses.

Wilson received the following annual bonuses, with an asterisk marking the years that she took FMLA leave:

| Year | Bonus |
|------|--------|
| 2008 | $3,000 |
| 2009 | $3,000 |
| 2010 | $3,500 |
| 2011 | $3,500 |
| 2012* | $2,000 |
| 2013* | $1,000 |
| 2014 | $3,000 |
| 2015* | $1,000 |

OPINION

Plaintiff pursues three claims: (1) an ADA reasonable accommodation claim; (2) a discrimination claim under the ADA; and (3) an FMLA retaliation claim.[11] Because the ADA claims fail for the same reason, the court considers those claims together and then

---

[11] Plaintiff made "passing reference" to an FMLA interference claim in her complaint, but explains that reference was "made in error" and does not oppose dismissal of that claim, to the extent such a claim was alleged. (Pl.'s Opp'n (dkt. #22) 32 n.2.)

turns to her FMLA retaliation claim.

## I. ADA Claims

The ADA prohibits employers from discriminating against employees with disabilities who are otherwise qualified. 42 U.S.C. § 12112(a). The Act defines "discriminate" broadly to include discrimination regarding job application procedures, job training, and other terms, conditions, and privileges of employment. *Id.* To prove disability discrimination under the ADA, a plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job; and (3) she suffered from an adverse employment action because of her disability. *Nese v. Julian Nordic Construction Co.*, 405 F.3d 638, 641 (7th Cir. 2005). To prove a failure to accommodate under the ADA, a plaintiff must show that: (1) she was a qualified individual with a disability; and (2) defendant was both aware of and failed to reasonably accommodate her disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). Once a covered employer becomes aware of an employee's disability, it must engage in "an 'interactive process' to determine the appropriate accommodation under the circumstances." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998).

For purposes of summary judgment, defendant Greenco does not dispute that Wilson has a disability as defined by the ADA. Instead, defendant focuses its motion on whether she is a "qualified individual" -- a requirement for both of her ADA claims. To determine whether an employee is "qualified" under the ADA, the court first considers whether the individual satisfies the prerequisites for the position, then evaluates whether the individual can perform the essential functions of the job with or without reasonable

accommodation. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018) (citing *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). Prerequisites for a job can include appropriate educational background, employment experiences, skills and license. *Id.*; *see also Budde v. Kane Cty. Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010).

Here, defendant does not dispute that plaintiff satisfied the prerequisites of the Supportive Living Services Coordinator position, which after all she held for thirteen years before her termination. Rather, defendant contends that Wilson was not qualified at the time of her termination because she was no longer able to work, with or without, a reasonable accommodation, for a multi-month period of time. In support, defendant directs the court to a relatively recent Seventh Circuit case, *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017). Similar to Wilson's claimed disability here, the plaintiff in that case suffered from serious back pain. In June 2013, Severson took a 12-week FMLA leave; on the last day of that leave, however, he had back surgery, which required him to remain off work for another two or three months. Severson asked to continue his leave, but the company denied his request and terminated his employment, while inviting him to reapply. Severson's work restrictions were lifted approximately three months later, though he did not reapply; instead, he filed a claim that his employer violated the ADA by failing to provide him a reasonable accommodation. The district court granted the employer's motion for summary judgment, and the Seventh Circuit affirmed in an opinion that effectively closes off plaintiff's claim here as well.

More specifically, the Seventh Circuit explained that "[t]he ADA is an

antidiscrimination statute, not a medical-leave entitlement." *Severson*, 872 F.3d at 479. Moreover, because the statute is limited to a "qualified individual," the court reasoned that "the term 'reasonable accommodation' is expressly limited to those measures that will enable the employee to work." *Id.*; *see also id.* at 481. Since "[a]n employee who needs long-term medical leave *cannot* work," the court explained such an employee "is not a 'qualified individual' under the ADA." *Id.* (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)). In so holding, the court specifically rejected the proposition of an "extended" leave as a "reasonable accommodation" under the ADA. *Id.* at 482.

In response, the plaintiff here argues that the Seventh Circuit acknowledged that the inquiry of whether an accommodation is reasonable is a fact-specific question, and further acknowledged that there may be circumstances where an extended leave may be a reasonable accommodation. (Pl.'s Opp'n (dkt. #22) 28.)[12] Consistent with its opinion in *Byrne*, the Seventh Circuit acknowledged that "[i]ntermittent time off or a short leave of absence—say, a couple of days or even a couple of weeks—may, in appropriate circumstances, be analogous to a part-time or modified work scheduled, two of the examples listed in § 12111(9)," the court, however, expressly held that "a medical leave spanning multiple months does not permit the employee to perform the essential functions

[12] Plaintiff also cites to *U.S. Airways v. Barnett*, 535 U.S. 391 (2002), for this proposition. In *Barnett*, the Supreme Court held that a request to deviate from an established seniority system is "ordinarily" not a reasonable accommodation under the ADA, although the Court also recognized that there may be "special circumstances" warranting an exception. So, too, here. Indeed, the court in *Severson* also acknowledged that there may be circumstances that would qualify as a reasonable accommodation (*e.g.*, short leave requests or intermittent leave). However, while acknowledging *Barnett*, the *Severson* court did not view it as an impediment for holding that an extended or long-term leave was not a reasonable accommodation. Bound by *Severson*, neither does this court.

of his job." *Id.* at 481.

Here, the undisputed facts demonstrate that Wilson was not able to return to work in *any* capacity until December 2016, and even then, was not capable of full-time work or anything approximating it.[13]   In other words, at the time that her employment was terminated, she was not capable of working *at all* and would have needed an additional, eight-month leave in order for her to be able to return to work, after having already been on approved FMLA leave for over four months.   Since the *Severson* court has concluded that the need for such an extended medical leave "does not permit [Wilson] to perform the essential functions of [her] job," 872 F.3d at 481, Wilson was not a qualified individual at the time of her termination; instead, she falls outside of the protections of the ADA.   *See Golden v. Indianapolis Housing Agency*, No. 17-159, 689 Fed. App'x 835, (7th Cir. Oct. 17, 2017) (applying "clear precedent" in *Severson* and *Byrne* to affirm the district court's entry of judgment, holding that an "employee who requires a multi-month period of medical leave is not a qualified individual under the ADA").[14]   Accordingly, the court will grant summary judgment to defendant on plaintiff's ADA claims.

---

[13] In December 2016, Dr. Sturm cleared plaintiff for part-time work, noting that she was only working 14 hours per week at that time, while also limiting that work to light duty with significant restrictions.

[14] The parties present other arguments with respect to plaintiff's ADA claims:  whether plaintiff requested an accommodation to trigger defendant's engagement in the interactive process; and whether plaintiff has put forth sufficient evidence to show that but for her disability she would not have been terminated.  However, the court need not reach these arguments since plaintiff has failed to make the threshold showing of demonstrating that she was a qualified individual at the time of her termination.

## II. FMLA Retaliation Claim

A plaintiff seeking to demonstrate FMLA retaliation "must present evidence of:  (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).  In her opposition brief, plaintiff pursues a claim that she was terminated because of her taking FMLA leave.[15]  To establish causation, "the plaintiff does not need to prove that 'retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'"  *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010)  (internal citations omitted).[16]  A retaliation claim also "requires proof of discriminatory or retaliatory intent while [an interference claim] requires only proof that the employer denied the employee his or her entitlements under the Act."  *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).

---

[15] In its opening brief, defendants assumed that plaintiff was also pursuing a retaliation claim based on Wilson receiving lower bonuses in the years she took FMLA leave, but in her opposition brief, she solely relies on this evidence as proof of discriminatory animus to support a finding of causation.

[16] Defendant points to retaliation claims arising under other federal statutes to argue that the causation standard is more exacting.  (Def.'s Reply Br. (dkt. #30) 16 (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (reviewing a Title VII retaliation claim, explaining "[a] retaliation claim requires proof of . . . but-for causation")).)  The Seventh Circuit, however, has yet to address the proper standard in the FMLA retaliation context.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.2 (7th Cir. 2014) (acknowledging that the causation standard in FMLA retaliation claims remained an open question); *Hall v. Bd. of Educ. of City of Chi.*, No. 14-CV-3290, 2018 WL 587151, at *7 (N.D. Ill. Jan. 29, 2018) (recent district court case recognizing that Seventh Circuit still has not addressed causation standard for FMLA retaliation claims).  As such, while the Seventh Circuit may adopt the stricter standard, this court will consider plaintiff's claim under the less restrictive standard suggested by the Seventh Circuit in *Goelzer*.

The Seventh Circuit has reiterated that district courts need no longer separate evidence into "direct" or "indirect" boxes, but should simply consider whether a reasonable factfinder could conclude that the protected factor led to the adverse employment action on the evidence of record. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In support of a finding of causal connection or discriminatory animus, plaintiff sets forth four categories of purported evidence:

> 1) Greenco failed to follow its own policies and procedures regarding employee medical leave when it terminated Wilson's employment at the conclusion of her FMLA without contacting her to discuss her return to work or potential accommodations; 2) the suspicious timing of Greenco's decision to terminat[e] her, which was followed by demonstrably false and shifting explanations for her termination; 3) Greenco consistently paid her a lower bonus during years in which she took FMLA leave, and 4) Greenco revised her job description prior to the expiration of her medical leave to include physical requirements it knew she could not perform.

(Pl.'s Opp'n (dkt. #22) 34.) While each of these four categories -- failure to follow procedures, suspicious timing, shifting explanations, past instances of discriminatory animus against a plaintiff, and suspicious changes in job description -- are all appropriate to consider in determining causation, the record here falls short of providing evidentiary support for those categories as addressed below. At the very least, plaintiff has failed to put forth sufficient evidence from which a reasonable jury could find a causal connection between her termination and her exercise of her rights under the FMLA to take an approved leave.

First, plaintiff asserts that defendant failed to follow its own policies and procedures in terminating Wilson's employment without contacting her to discuss the possibility of

an extended leave. Not so. Indeed, plaintiff offers no evidence of such a policy or procedure. At most, the record reflects that for plaintiff's first two FMLA leaves, she received additional leave of a week or two beyond her approved 12-weeks of FMLA leaves, but there is *no* evidence that it was Greenco's policy to reach out to employees to make that arrangement. Instead, the record demonstrates that during her first two FMLA leave, *Wilson* would contact Greenco, keeping her employer abreast of her recovery and her need for additional time off. Zweifel even testified that she *avoided* such contact out of fear that she would be intruding on an employee's privacy interests. Moreover, while the January 26, 2016, letter was certainly inartfully worded, it did tell Wilson *to let Greenco know* if she had any questions or required further information, thus following Greenco's apparent (albeit written and informal) policy of placing the responsibility on the employee to seek additional leave if required. Regardless, plaintiff has offered no evidence that would permit a reasonable trier of fact to find that Greenco ever had a policy of negotiating extended leaves for multiple months past approved leave, much less reaching out to an employee to negotiate such an extended leave.

Second, plaintiff would point to "the suspicious timing of Greenco's decision to terminat[e] her." (Pl.'s Opp'n (dkt. #22) 34.) On the contrary, the timing of her termination simply coincided with the end of her 12-weeks of FMLA leave for calendar year 2016. If this were enough evidence to establish suspicious timing, then any employee terminated for failing to return to work after exhausting all available FMLA leave would have a basis for asserting an FMLA retaliation claim. Instead, plaintiff must offer proof that she was terminated *because she took FMLA leave*, not because her leave was exhausted.

Relatedly, plaintiff suggests that Greenco offered "shifting explanations for her termination," but again the record lends no support for this assertion. Indeed, the evidence shows that the reason for her termination remained constant. The only arguable "shift" on Greenco's part was whether it actually intended to terminate Wilson's employment immediately after she failed to return to work on March 28, 2016. However, defendant's contradictory position, at least at times, as to the timing of Wilson's termination is *not* evidence of pretext; if anything, this evidence actually supports Zweifel's and Mathys' expressed belief that Wilson could have contacted them to discuss the need for an extended leave. While their belief may have been unreasonable in light of other language in the letter, plaintiff has failed to explain how the possibility of an open-ended date for her official termination supports a finding of a causal connection between her termination and taking protected FMLA leave.

Third, plaintiff points to evidence that she received lower bonuses during the years in which she took FMLA leave. The undisputed record, however, demonstrates that these bonuses were discretionary, and the amounts turned, at least in part, on the financial success of Greenco in any given year. In response, plaintiff failed to present any evidence as to whether Wilson's bonus compared favorably or unfavorably to other employees for the years that she took FMLA. On this record, a fact finder could only speculate that Wilson received a lower bonus as compared to other employees in the years that she took FMLA, rather than because of other, unrelated economic factors. *See Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) ("[S]ummary judgment is 'not a dress rehearsal or practice run,' but the 'put up or shut up moment' in

which a proponent of facts must show what evidence it has to convince a trier of fact to accept its version of events.") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). And even if it were some limited basis to suspect animus, a reasonable fact finder would truly be speculating that the lower relative bonuses in those years is evidence of her being terminated for taking FMLA leave, especially when Wilson was offered an unqualified right to return to work not once, not twice, but three times after taking the maximum amount of FMLA leave.[17]

Fourth, plaintiff points to Greenco's revising of her job description "prior to the expiration of her medial leave to include physical requirements it knew she could not perform." (Pl.'s Opp'n (dkt. #22) 34.) As defendants points out, plaintiff simply represents that she had not seen the "new" job description until January 2016 while she was on leave, stopping short of averring that the job description was actually changed while she was on leave, much less in an effort to force her out. Moreover, Zweifel testified that the job description was actually amended in approximately 2005, well before plaintiff's third FMLA leave, and indeed, before any of her FMLA leaves. Regardless, the undisputed evidence shows that Greenco *consistently* abided by any doctor-prescribed restrictions -- most notably, the weight restriction -- in allowing Wilson to return to work after previous leaves, and that it maintained those restrictions for as long as deemed medically necessary, including the 20-pound weight restriction for at least the two-year period leading up to her third FMLA leave. Again, this evidence is insufficient for a reasonable trier of fact to infer

---

[17] Admittedly, plaintiff was not ultimately allowed to return a third time, but that was only after receiving no word from her for months after her authorized leave had come to an official end.

a Machiavellian plot to shift job requirements while Wilson was on FMLA leave, not least of which is that Greenco *never* resorted to this supposedly suspicious change to justify her termination.

Whether viewed independently or collectively, plaintiff's shreds of supposed evidence of animus simply do not provide sufficient support for a reasonable fact finder to conclude that there was a causal connection between her taking protected FMLA leave and her ultimate termination. Instead, the undisputed evidence supports a finding that she was terminated because she was unable to return to work. As such, the court must also grant defendant's motion for summary judgment on plaintiff's FMLA retaliation claim.

## ORDER

IT IS ORDERED that:

1)  Defendant Greenco Industries, Inc.'s motion for summary judgment (dkt. #10) is GRANTED.

2)  The clerk of court is directed to enter final judgment in defendant's favor.

Entered this 7th day of March, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge